**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

DAVID SUSSMAN a/k/a MARK SUSSMAN, M.D.,   :
on behalf of himself and all others similarly situated,   :
                              :       **Case No.:** 12- CV-0181
                              :
                Plaintiff,   :
                              :
       -against-             :
                              :
I.C. SYSTEM, INC.,                :
                              :
                Defendant.   :
                              :
-----------------------------------------------------------------------X


## <u>Memorandum in Support of Motion to Dismiss</u>


**KENNETH A. ELAN, ESQ.**
**217 Broadway, Suite 603**
**New York, NY 10007**
**(212) 619-0261**

# Table of Contents

I. Statement of the Facts…………………………………………………………………….......5

II. Summary of the Argument………………………………………………………………….6

   1. The Standard of Review on the Instant Motion………………………..………………8

   2. Sussman's Claim under New York Law is Preempted…………………………………...9

   3. No Claim for Relief is stated under the FDCPA…………………………………...……17

III. Conclusion…………………………………………………………………………....………24

## Table of Authorities

**Cases**

*Akalwadi v. Risk Mgmt. Alts., Inc.,* 336 F. Supp. 2d 492 (D. Md.2004)………...............…….......17

*Altria Group Inc. v. Good,* 555 U.S. 70 (2008)………………………………………………………15

*Beattie v. D.M. Collections, Inc.,* 751 F. Supp. 383 (D. Del. 1991)……..………………………23

*Carman v. CBE Group, Inc.,* 782 Supp. 2d 1223 (D. Kan. 2011)………..…………………17, 18

*Chavious v. CBE Group, Inc.,* 2012 U.S. Dist. LEXIS 4362
(E.D.N.Y. January 12, 2012)………………………………………………..……………16, 18, 19, 23

*Clingaman v. Certegy Payment Recovery Svcs.,* 2011 WL 2078629
(S.D. Tex. May 26, 2011)………………………………………………………………………18, 19

*Fashakin v. Nextel Commc'ns,* 2009 WL 790350 (E.D.N.Y. Mar. 25, 2009)………………..……19

*Gottlieb v. Carnival Corp.*, 2011 U.S. Dist. LEXIS 151608 (E.D.N.Y. Feb. 1, 2011)… ............ 10

*Gottlieb v. Carnival Corp.*, 367 F. Supp. 2d 301 (E.D.N.Y. 2005), *vacated on other grds.*, 436 F.3d 335 (2d Cir. 2006).................................................................................................... 10

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ........................................ 12

*Holster v. Gatco, Inc.*, 618 F.3d 214 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 2151 (2011)............................................................................................................................................. 15

*Hovila v. Tween Brands, Inc.*, 2010 U.S. Dist. LEXIS 34861 (W.D. Wash. Apr. 7, 2010) ........................................................................................................................................... 12

*Howe v. Reader's Digest Ass'n, Inc.,* 686 F. Supp. 461 (S.D.N.Y. 1988)…………………………22

*Hyman v. Tate,* 362 F.3d 965 (7th Cir. 2004)………………………………………………………21

*International Science & Technology Inst. v. Inacom Communications, Inc.*, 106 F.3d 1146 (4th Cir. 1997)..................................................................................................................... 14

*Jones v. Rash Curtis & Assocs.*, 2011 WL 2050195 (N.D. Cal. January 3, 2011)………..……18

*Katz v. Asset Acceptance, LLC,* 2006 WL 3483921 (E.D.N.Y. Nov. 30, 2006)……..……....21, 22

*Kavalin v. Global Credit & Collection Corp.,* 2011 WL 1260210
(W.D.N.Y. Mar. 31, 2011)…………………………………………………………………...……17

*Klein v. Vision Lab Telecommunications, Inc.*, 399 F. Supp. 2d 528 (S.D.N.Y. 2005) ............... 10

*Kort v. Diversified Collection Serv. Inc.,* 394 F.3d 530 (7th Cir. 2005).............................21

*Lynch v. Nelson Watson & Assocs.*, *LLC*, 2011 WL 2472588, at *2
(D. Kan. June 21, 2011)...............................................................................................17

*Mammen v. Bronson & Migliaccio, LLP,* 715 F. Supp.2d 1210 (M.D. Fla. 2009)..................19

*Meadows v. Franklin Collection,* 414 Fed. Appx. 230, 2011 U.S. App. LEXIS 2779
(11th Cir. 2011) (unpublished)..................................................................................... 9

*Meilleur v. AT&T Inc.*, 2011 U.S. Dist. LEXIS 132473 (W.D. Wash. Nov. 16, 2011) ............... 13

*New York SMSA L v. Town of Clarkstown*, 612 F.3d 97 (2d Cir. 2010)....................................... 16

*North Dakota v. FreeEats.com, Inc.*, 2006 N.D. 84, 712 N.W.2d 828 (2006) ............................. 12

*Patriotic Veterans, Inc. v. Indiana*, 2011 U.S. Dist. LEXIS 110787 (S.D. Ind. Sept. 27,
(2011), *appeal pending*, No. 11-3265 (7th Cir.) (argued Jan. 20, 2012) .................................. 10

*Pipiles v. Credit Bureau of Lockport,* 886 F.2d 22 (2d Cir. 1989)....................................20

*Prewitt v. Wolpoff & Abramson, LLP,* 2007 WL 841778
(W.D.N.Y. March 19, 2007)............................................................................................19

*Rucker v. Nationwide Credit, Inc.,* 2011 WL 25300 (E.D. Cal. Jan. 5, 2011).........................19

*Smith v. Transworld Systems, Inc.,* 953 F.2d 1025 (6th Cir. 1992)....................................21

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) ............................................................................ 16

*Tucker v. CBE Group, Inc.,* 710 F. Supp. 2d 1301 (M.D. Fla. 2010)...........................18

*Udell v. Kan. Counselors, Inc.* 313 F. Supp.2d 1135 (D. Kan. 2004)................................19

*United States v. Locke*, 529 U.S. 89 (2000)................................................................................... 16

*Utah Division of Consumer Protection v. Flagship Capital*, 2005 UT 76, 125 P.3d 894
(2005) .......................................................................................................................... 13

*Van Bergen v. State of Minnesota*, 59 F.3d 1541 (8th Cir. 1995).................................................. 14

*Williams v. Taylor*, 529 U.S. 362 (2000) ..................................................................................... 11

**Statutes and Rules**

Fair Debt. Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et.seq*...........................5

FDCPA, §1692c - 1692f… ……………………………………………………………………6

FDCPA, §1692k(c)……………………………………………………………………….8,20

FDCPA, §1692d(5)……………………………………………………………………...17,18

FDCPA, §1692d(6)……………………………………………………………………19, 20

FDCPA, §1692c……....…………………………………………………………….. 20, 21

FDCPA, §1692f(2)(4)……………………………………………………………… 21

FDCPA, §1692e(10), (11)……………………………………………………………….23

FDCPA, §1692e(2)(A)……………………………………………………………….. 23

New York General Business Law, § 396-aa .................................................................................. 10

New York General Business Law, § 399-p ........................................................................... 6, 9, 16

Telephone Customer Protection Act, 47 U.S.C. § 227 ..................................................................... 6

Telephone Customer Protection Act, 47 U.S.C. § 227(f)(1) ............................................... 10, 15, 16

Fed. R. Civ. P. 12(b)(6) ………………………………………………………………..5

Fed. R. Civ. P. 56……………………………………………………………….….8

Fed. R. Civ. P. 9(b)…………………………………………………………………23

## Statement of the Facts

Defendant I.C. System, Inc. ("IC") submits this memorandum in support of its motion to dismiss and/or for summary judgment pursuant to Fed. R. Civ. P. 12(b)(6) and 56. IC is a debt collector within the meaning of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et seq.* Plaintiff is identified in the Complaint as a "citizen of the State of New York residing in Monsey, New York."[1] The pertinent allegations of the Complaint are stated below:

(i)     From on or about October 1, 2011 to November 23, 2011, in an attempt to collect a debt, IC, using an automatic dialing-announcing device, made over 50 telephone calls to plaintiff's residential telephone lines without his consent, which caused his telephone to ring;[2]

(ii)    IC's calls terminated prior to or as soon as plaintiff, someone in plaintiff's household or plaintiff's voice mail answered the telephone call;[3]

(iii)   In these telephone calls, IC failed to identify the name of the person making the call, the person on whose behalf these calls were being made and the address and telephone number of the person on whose behalf the calls were being made;[4] and

(iv)    IC continued to make telephone calls after plaintiff informed IC that he

---

[1] Complaint, ¶9. A copy of the Complaint is annexed to the accompanying Affirmation of Kenneth A. Elan ("Elan Affirmation") as Exhibit "A."

[2] Complaint, ¶19. Contrary to the allegations of the Complaint, IC's records show that plaintiff's account was not placed into its system for collection until November 3, 2011 and that no attempt was made to collect the debt before such date. Affidavit of Ryan Bacon in Support of Motion ("Bacon Aff."), ¶4.

[3] Complaint, ¶19. Again, contrary to the allegations of the Complaint, at no time did plaintiff or anyone else in his household answer the calls. Bacon Aff., ¶ 7. As a result, IC's Automatic Dialer System terminated each call without leaving a message. *Id.*

[4] Complaint, ¶20.

did not owe anything and asked IC to stop harassing him.[5]

## Summary of the Argument

On the basis of these allegations plaintiff alleges that IC violated section 399-p of the New York General Business Law ("GBL") and sections 1692c-1692f of the FDCPA. Issue was joined on or about February 6, 2012 when IC served and filed an Answer denying the substantive allegations and asserting various affirmative defenses.[6] The Court does not have to reach the merits of the claim under section 399-p since the claim is preempted by the federal Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, which governs the use of automatic dialing-announcing devices in *interstate* telephone calls. At bar, all of IC's calls to plaintiff's residence in New York were made from Minnesota.[7]

Dismissal or summary judgment is appropriate with respect to plaintiff's FDCPA claims too. While not entirely clear, plaintiff alleges in his Second and Third Claims that the (unanswered) calls constitute harassment, an intent to annoy, etc., under the statute. Plaintiff also alleges a FDCPA violation due to IC's failure to leave a message before terminating the calls. However, well-settled case law holds that where, as here, a debtor has *not* directed a debt collector to cease and desist from calling, telephone calls made during reasonable hours that go unanswered or to voice mail do not constitute harassment or an intent to annoy.[8] Furthermore, there is no duty under the FDCPA for a debt collector to leave a message prior to terminating a

---

[5] Complaint, ¶21.

[6] A copy of IC's Answer is annexed to the Elan Affirmation as Exhibit "B."

[7] Bacon Aff., ¶6.

[8] According to IC's records, the Automatic Dialer System only called plaintiff's residence 2.5 times/day on average over a period of 20 days (i.e., from November 4, 2011 to and including November 23, 2011) and the hours of 8 A.M. and 8:59 P.M. (New York Time). No call was made less than 90 minutes after the preceding call. Altogether, there were 51 attempts to contact plaintiff via telephone. See, Exhibit "1" to Bacon Aff.

6

call.

Besides complaining about the volume of calls and lack of any message plaintiff alleges that IC violated section 1692c(c) since calls were made to his residence after he notified IC that he disputed the debt.[9] IC records show that it received and entered plaintiff's dispute of the debt into its "ICE-System" [10] on November 23, 2011.[11] The records further show that no more calls were made to plaintiff after that date.[12]

There was no "skullduggery" or "plan" to harass plaintiff. Instead, the information pertaining to his dispute of the debt was transmitted on the night of November 23, 2011 by the ICE-System to its Automatic Dialer System.[13] Once the information pertaining to plaintiff's dispute of the debt was received and entered by the dialer system no more calls were made to his residence.[14]  Simply stated, the two systems are not linked. Instead, information is updated daily from the ICE-System to the dialer system. Therefore, information transmitted by the former cannot be acted upon by the latter system until the following day at the earliest (which is what occurred in this case).

---

[9] Complaint, ¶21.

[10] The "ICE-System" is the computer program used by IC to store relevant information pertaining to a debtor's account including the date the account was set up; the amount of the debt; the date an initial claim letter was mailed to the debtor; other attempts made to collect the debt (*e.g.,* telephone calls and additional correspondence); and, the date a letter or other correspondence from a debtor or person acting on his behalf disputing the debt was received and entered into the system. Bacon Aff., ¶3.

[11] Bacon Aff., ¶8.

[12] Bacon Aff., ¶8. Furthermore, there were only 3 more calls on November 23, 2011.

[13] The Automatic Dialer System is used by IC for the sole purpose of contacting debtors. Bacon Aff., ¶5.

[14] In fact, IC's records show that all collection efforts ceased. Bacon Aff., ¶8.

Thus, IC's "error," if any, in transmitting the information overnight from system to system was at most inadvertent. Furthermore, IC has policies, procedures and daily supervision in place that require all debt collection activities to cease once a debtor notifies IC that he disputes a debt. While the policies and procedures do not prevent errors 100% of the time, they are not required to do so. The bona fide error defense only requires that a debt collector take reasonable measures to prevent such errors. IC is therefore entitled to the benefit of the bona fide error defense set forth in section 1692k(c) of the statute.

Finally, the dearth of allegations in the Complaint and the averments in the Bacon Affidavit demonstrate that IC did not use false or deceptive means in order to collect the debt.

## I. ARGUMENT

### 1. The Standard of Review on the Instant Motion

Summary judgment will be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court may not grant a motion for summary judgment unless "the pleadings...affidavits... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). It is also well settled that once the party seeking summary judgment meets its initial burden the non-moving party must come forward with specific facts establishing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). Moreover, the Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986), that the existence of "a mere scintilla of evidence" is insufficient to stave off

summary judgment. Therefore, the non-movant may not rest upon conclusory allegations or denials, but instead must set forth "concrete particulars" showing that a trial is necessary. *R. G. Group, Inc. v. Horn & Hardart Co.,* 751 F. 2d 69, 77 (2d Cir. 1984), *cited in Puglisi v. Debt Recovery Solutions, LLC,* 2011 WL 459334 at *4 (E.D.N.Y. 2011).

At bar, the pertinent facts are not readily in dispute. Questions of law only are before the Court with respect to whether (i) the TCPA preempts plaintiff's state law claim and (ii) a claim is stated under the FDCPA.

### 2. Sussman's Claim under New York Law is Preempted

The TCPA, 47 U.S.C. § 227, applies to the use of automatic dialers. It prohibits their use except where the FCC has ruled the types of calls exempt. As the Eleventh Circuit found in *Meadows v. Franklin Collection,* debt collectors (such as IC) are exempt. 414 Fed. Appx. 230, 235, 2011 U.S. App. LEXIS 2779, at *12-13 (11th Cir. 2011) (unpublished).[15] Sussman does not bring a claim under the TCPA. It is relevant, however, because he does bring a claim under section 399-p of the New York GBL. The issue on this motion: Is section 399-p preempted insofar as it applies to calls made from outside New York, as the calls in this case were? *See,* Bacon Aff., ¶6.

Specifically, does the TCPA's savings clause mean that state laws that have "more restrictive . . . requirements or regulations on" autodialers than does the TCPA itself are preempted? The key language of the TCPA is:

> (f) Effect on State law.
>
> (1) State law not preempted. Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this

---

[15] A copy of the *Meadows* decision is annexed to the Elan Affirmation as Exhibit "C."

section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits –

. . .

(B) the use of automatic telephone dialing systems.

47 U.S.C. § 227(f)(1).[16]

Few cases have addressed this issue. *Klein v. Vision Lab Telecommunications, Inc.*, was a junk-fax case. The relevant GBL provision was section 396-aa, but the principle is the same as to auto-dialers. The savings clause, Judge Conner found, meant that New York's junk-fax provision did not apply to faxes sent from outside of New York. 399 F. Supp. 2d 528, 542 (S.D.N.Y. 2005).[17]

The most recent case on the preemption issue is currently on appeal to the Seventh Circuit, *Patriotic Veterans, Inc. v. Indiana*. It considered Indiana's virtual ban on the use of automatic dialers for making calls to people in the state. 2011 U.S. Dist. LEXIS 110787 (S.D. Ind. Sept. 27, 2011).[18] The district court found the state law preempted, based largely upon its reading of the savings clause.

---

[16] The Truth in Caller ID Act of 2009, effective December 22, 2010, redesignated subsection (e)(1) of section 227 subsection (f)(1). The provision was itself unaltered. 111 P.L. 331, 124 Stat. 3572 (Dec. 22, 2010). The bulk of the cases referred to herein refer to the savings clause as section 227(e)(1).

[17] Judge Conner relied on Judge Glasser's opinion in *Gottlieb v. Carnival Corp.*, 367 F. Supp. 2d 301 (E.D.N.Y. 2005), *vacated on other grounds*, 436 F.3d 335 (2d Cir. 2006), for his conclusion. In vacating the dismissal, the Second Circuit essentially took "no position" on the dismissal of the state claim on preemption grounds beyond saying that the New York statute was not "on its face" limited to intrastate faxes. 436 F.3d at 343. After the vacate/remand, Judge Glasser had no occasion to address the preemption issue. In his final, post-trial opinion in the case, he found that because Carnival Corp. had established a defense to the claim under the New York law, "I do not address... the preemption defense any further". 2011 U.S. Dist. LEXIS 151608, at *14 (E.D.N.Y. Feb. 1, 2011), showing that he felt the issue remained open after the Second Circuit's decision in the case.

[18] No. 11-3265 (7th Cir.). Oral argument was held on January 20, 2012.

Observing that "[t]he TCPA does not contain an express preemption clause," the court found that the savings clause "by implication, suggests that Congress intended for state laws outside of that defined universe to be preempted." 2011 U.S. Dist. LEXIS 110787, at *6. The legislative history of the provision, it continued, sustained this interpretation. That history evidenced Congress's view (since found to be in error) that, as the Senate Report put it, "States do not have jurisdiction over interstate calls." S. REP. NO. 102-178 (1991), *quoted at id.*. at *7. That history shows Senator Hollings, a TCPA co-sponsor, saying, "[p]ursuant to the general preemptive effect of the Communications Act of 1934, State regulation of interstate communications, including interstate communications initiated for telemarketing purposes, is preempted." 137 CONG. REC. S18781-02, S18784, *quoted at id.*, at *8.

> The language of the savings clause coupled with the consistent legislative history leads the Court to determine that the TCPA was enacted with the purpose of establishing exclusive regulations relating to the interstate use of automatic telephone dialing systems, as well as establishing regulations that would apply to their intrastate use unless a particular state chose to enact (or already had enacted) more stringent regulations. To read the TCPA otherwise would render the word "intrastate" within the savings clause entirely meaningless and thus be inconsistent with the "cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000). If Congress intended for the TCPA to have no preemptive effect, it would not have included the word "intrastate" in the savings clause; the fact that it did indicates that it intended for state laws relating to the interstate use of automatic telephone dialing systems-or at least a portion of those laws, as discussed below-to be preempted, while more restrictive intrastate laws would be enforceable.

*Id.*, at *8-9.

Earlier this year, the Supreme Court discussed the history of the TCPA and also quoted from the Senate report that "[B]ecause States do not have jurisdiction over interstate calls[,] [m]any States have expressed a desire for Federal legislation . . . ." *Mims v. Arrow Financial Servs., LLC*, 132 S. Ct. 740, 745 (2012) (alterations in *Mims*). "In general, the Communications Act of 1934 grants to the Federal Communications Commission (FCC or Commission) authority

to regulate interstate telephone communications and reserves to the States authority to regulate intrastate telephone communications." *Id*, at n.1.

Sussman has identified a number of cases that have considered whether a state *prohibition* is preempted. These cases hold that the savings clause allows a state law to impose "more restrictive requirements or regulations on" the intrastate use of auto-dialers, etc. and state law to "prohibit" the use of such devices. None even suggest that a state law that imposed "more restrictive intrastate requirements or regulations" than the statute's rules on interstate users of the devices is permitted. In each, the analysis is whether "intrastate" applies, and limits, the right to *prohibit* in addition to the right to regulate.

Take *North Dakota v. FreeEats.com, Inc.* where the operative paragraph reads:

> The word "or" is disjunctive in nature and ordinarily indicates an alternative between different things or actions. Terms or phrases separated by "or" have separate and independent significance. Coupled with the comma preceding "or," which indicates a separate clause, the statutory language clearly creates two distinct and independent phrases. Thus, read logically and grammatically, the statute states that nothing in the TCPA preempts any state law "that imposes more restrictive intrastate requirements or regulations on" the enumerated classes of calls, and nothing in the TCPA preempts any state law "which prohibits" calls within the enumerated list. "Intrastate" unambiguously modifies only the first clause, not the second. If Congress had intended that the second part of the statute apply only to intrastate calls, "it could simply have said that." Because the statutory text is unambiguous, our inquiry into its meaning ends there.

2006 N.D. 84, ¶ 14, 712 N.W.2d 828, 834 (2006) (final quotation from *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 218 (2002)) (citations omitted). North Dakota prohibited the "placement of political polling calls using an automatic dialing-announcing device." The statute was not preempted. 2006 N.D. 84, ¶ 1, 712 N.W.2d at 831.

As the North Dakota Supreme Court noted, Congress could have used "intrastate" for both the regulation and prohibition parts of the TCPA but did not, and could have *not* used "intrastate" for either but did not.

In *Hovila v. Tween Brands, Inc.*, the analysis was the same:

> [T]he Court finds that the language and grammatical constructs of § 227(e) do not reveal a congressional intent to preempt state laws prohibiting interstate use of automated dialing and announcing devices. Read logically and grammatically, § 227(e) expressly saves from preemption two distinct and independent categories of state law, namely any state law (1) "that imposes more restrictive intrastate requirements or regulations on . . . the use of automatic telephone dialing systems" and any state law (2) "which prohibits . . . the use of automatic telephone dialing systems." "That imposes" and "which prohibits" are parallel constructions introducing the two kinds of state laws that are not preempted. The word "intrastate" in the first clause is an adjective that can modify only "requirements" and "regulations." "Intrastate" cannot, under any stretch of grammar or common usage, modify "which prohibits." Thus, state laws prohibiting the use of automatic telephone dialing systems, such as the WADAD, are expressly saved from preemption.

2010 U.S. Dist. LEXIS 34861, at *23-24 (W.D. Wash. Apr. 7, 2010). The analysis was repeated in *Meilleur v. AT&T Inc.*, 2011 U.S. Dist. LEXIS 132473, at *12-13 (W.D. Wash. Nov. 16, 2011). Here, too, the state statute in question *prohibited* the use of auto-dialers. It was not preempted.

In *FreeEats.com*, the court noted that the defendant "essentially ignores the language of the statute." 2006 N.D. 84, ¶ 14, 712 N.W.2d at 834. So did the Utah Supreme Court in *Utah Division of Consumer Protection v. Flagship Capital*. It never refers to section 227(e). In a sense, though, it did not have to. The statute at issue was a blanket prohibition on the use of automatic-dialers. 2005 UT 76, ¶ 17, 125 P.3d 894, 899 (2005). Indeed, *FreeEats.com* criticized the defendant for making a policy (as opposed to a legislation-interpreting) argument. The Utah Supreme Court does just that. 2005 UT 76, ¶ 22, 125 P.3d at 900.

Graphically, these cases hold:

|  |  | Yes | No |
|---|---|---|---|
| Regulation | Intrastate | X |  |
|  | Interstate |  | X |
| Prohibition | Intrastate | X |  |
|  | Interstate | X |  |

The reference to "more restrictive" is important. In another of the cases passed on by Sussman's counsel, the Eighth Circuit observed that "[t]he TCPA carries no implication that Congress intended to preempt state law; the statute includes a preemption provision expressly not preempting *certain* state laws." *Van Bergen v. State of Minnesota*, 59 F.3d 1541, 1547 (8th Cir. 1995) (emphasis added). As to the state statute before it, it found that it "is not in actual conflict with the TCPA," is "'virtually identical' to the TCPA," and applied to calls not covered by the federal act. In short, the Minnesota act did not impose more restrictive regulations on calls covered by the TCPA. There was no preemption.

Finally, in the Fourth Circuit's *International Science & Technology Inst. v. Inacom Communications, Inc.*, the issue was whether state courts were the exclusive venue for actions brought under the TCPA.[19] International Science wished to proceed in federal court, and one of its arguments was that there was concurrent jurisdiction because Congress had "manifested . . . its preemptive occupation of the field of interstate telecommunications". 106 F.3d 1146, 1153 (4th Cir. 1997). The Fourth Circuit found not only that this argument was wrong as a general proposition but, and this is its potential relevance in this case, Congress had *not* completely preempted state laws in the TCPA. "International Science's preemption argument must be rejected at its beginning because Congress stated that state law is not preempted by the TCPA. *See* 47 U.S.C. § 227(e) [now (f)] ('nothing in this section . . . shall preempt any State law that imposes more restrictive intrastate requirements . . . *or* which prohibits' certain enumerated practices (emphasis added))". *Id.* The emphasis on "or" is enlightening. It presumably reflects the Fourth Circuit's recognition, consistent with the other cases from Sussman, that what matters from an interstate perspective is the TCPA's non-preemption of a state's prohibition of "certain

---

[19] In *Mims*, the Supreme Court held that federal and state courts have concurrent jurisdiction over TCPA claims. 132 S. Ct. 740, 745.

enumerated practices" that enter the state from elsewhere. Plus, of course, the court did not address the issue here, i.e., whether a state may impose more restrictive regulations on calls coming into it from other states.

All of this is neither here or there, Sussman says, because the Second Circuit said, "the statute expressly declined to preempt state regulations that were more restrictive of telemarketing than the minimal federal requirements of the statute". *Holster v. Gatco, Inc.*, 618 F.3d 214, 218 (2d Cir. 2010) (citing 47 U.S.C. § 227(e)(1) (now 227(f)(1))), *cert. denied*, 131 S. Ct. 2151 (2011). The problem with this formulation, as detailed in the last several pages, is that the statute *did not* "expressly decline[ ] to preempt state regulations that were more restrictive of telemarketing than the minimal federal requirements of the statute". For want of a word, the argument is lost. That word, of course, is "intrastate" for as the above cases that found state law not preempted, the statute "expressly declined to preempt" regulations of intrastate calls that are more restrictive than those imposed by the TCPA on interstate calls. As we noted, it would have been an easy matter for Congress in section 227(f)(1) to have provided "nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive requirements or regulations" but it didn't. It included the word "intrastate" and as *Patriotic Ventures* pointed out when Congress chooses to use a word, a court should try to give it meaning. 2011 U.S. Dist. LEXIS 110787, at *8-9.

The only thing that Congress "expressed" as to state restrictions that are more restrictive than those of the TCPA is that *intrastate* ones are not preempted. For the Second Circuit to have said otherwise is error.

In certain cases, of course, there is a presumption against preemption.

> The key to the preemption inquiry is the intent of Congress. Congress may manifest its intent to preempt state or local law explicitly, through the express

language of a federal statute, or implicitly, through the scope, structure, and purpose of the federal law. By their nature, field preemption and conflict preemption are usually found based on implied manifestations of congressional intent. Even where a federal law contains an express preemption clause, the court still may be required to consider implied preemption as it considers "the question of the substance and scope of Congress' displacement of state law." *Altria Group [Inc. v. Good*, 555 U.S. 70, 129 S. Ct. 538,] 543 [(2008)] . . . . The presumption has not generally been applied when a local government regulates in an area "where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000); *see Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003) (refusing to apply presumption in favor of state contract and consumer protection laws in telecommunications case "because of the long history of federal presence in regulating long-distance telecommunications").

*New York SMSA L v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (some citations omitted). Again "the intent of Congress," as shown above is clear. States can (i) impose stricter regulations on those who use autodialers *intrastate* and (ii) states can ban the use of autodialers in *and into* their states. When section 227(f)(1) was enacted (as 227(e)(1)), it was a simple matter for a company to identify all area codes in a particular state that *banned* calls via autodialers and block the making of such calls. It is far different to compel a company from determining what the standard was for the 49 states (it is bound by the requirements for intrastate calling) and applying the resulting smörgåsbord to those area codes. Telecommunications is an area about which the Second Circuit recognized as long having a "'federal presence'" (and one in which Congress when it enacted the TCPA considered exclusively a federal preserve in the interstate realm) and one in which any presumption-against-preemption is readily rebutted by the text of section 227(f)(1).

Because section 399-p of the New York GBL attempts to impose more restrictive requirements on interstate calls into New York than are imposed by the TCPA, it is preempted by that federal act and Sussman's claim under it must be dismissed.

## 3. No Claim for Relief is Stated under the FDCPA

Judge Seybert's recent decision in *Chavious v. CBE Group, Inc.*, 2012 U.S. Dist. LEXIS 4362 (E.D.N.Y. Jan.12, 2012), is persuasive authority as to the lack of merit of any claim under section 1692d. In *Chavious*, the defendant was a debt collector that in attempting to collect a debt repeatedly called a cellular telephone number that it erroneously believed belonged to an unnamed debtor. The telephone number was actually that of the plaintiff who was not related to the debtor. The defendant called the plaintiff 36 times between January 20 and March 19, 2010. No one answered the calls and the defendant never left a voice mail message. Just as in the instant case, the calls were placed between 8:00 A.M. and 9:00 P.M. However, unlike here, on at least one occasion, the plaintiff returned the defendant's call, was put on hold and hung up after a few minutes without speaking to a live operator. Eventually, the defendant stopped calling the plaintiff's telephone number because it failed to make contact with him.

Based on these facts, the plaintiff alleged that the defendant violated section 1692(d) since the defendant "caused a telephone to ring...repeatedly or continuously with intent to annoy, abuse or harass...and placed telephone calls without meaningful disclosure of the caller's identity." *Id.* at *4. Judge Seybert held that as a matter of law, the defendant's telephone calls to plaintiff's cellular phone did not rise to the level of a FDCPA violation. Citing *Lynch v. Nelson Watson & Assocs., LLC*, 2011 WL 2472588, at *2 (D. Kan. June 21, 2011), the court held that in evaluating whether repeated telephone calls were made "with intent to annoy, abuse or harass," courts generally consider the volume and pattern of calls. The court observed that a caller's intent is often a jury question (citing *Kavalin v. Global Credit & Collection Corp.*, 2011 WL 1260210, at *4 (W.D.N.Y. Mar. 31, 2011), and *Akalwadi v. Risk Mgmt. Alts., Inc.*, 336 F. Supp. 2d 492, 506 (D. Md.2004) ("The reasonableness of this volume of calls and their pattern is a question of fact for the jury.")). However, Judge Seybert held that the plaintiff failed to establish

a triable issue of fact. She noted that courts have awarded defendants summary judgment where the volume and pattern of calls demonstrated an intent to contact debtors rather than an intent to annoy, abuse or harass them (citing, *Carman v. CBE Group, Inc.*, 782 Supp. 2d 1223, 1232 (D. Kan. 2011)). The court determined that the facts showed an intent by the defendant to establish contact with the plaintiff rather than an intent to harass (citing, *Tucker v. CBE Group, Inc.*, 710 F. Supp. 2d 1301, 1305 (M.D. Fla. 2010)).

The court noted that in *Carman* and *Tucker*, as in the case before her, the debt collector was unable to reach anyone on the other end of the telephone and the call recipient did not ask the defendant to refrain from calling. *That is precisely what occurred at bar*. At no time prior to receipt and entry of plaintiff's letter disputing the debt into the ICE-System on November 23, 2011, did plaintiff contact IC in order to direct it to refrain from making further calls.[20] Judge Seybert held that the volume and pattern of calls in *Chavious*--36 calls over nine weeks and all made at reasonable times and not one immediately following the other--was consistent with cases in which other courts had granted defendants summary judgment. *See, e.g., Lynch,* 2011 WL 2472588, at *2 (56 telephone calls over approximately 3 months, without more, was not a FDCPA violation); *Carman,* 782 F. Supp. 2d at 1227 (149 telephone calls over 2 months, without more, was not a violation); *Clingaman v. Certegy Payment Recovery Svcs.,* 2011 WL 2078629, at *4 (S.D. Tex. May 26, 2011) (55 calls between March 4 and June 18 was not a violation where plaintiff never asked defendant to stop calling); *Jones v. Rash Curtis & Assocs.,* 2011 WL 2050195, at *2-3 (N.D. Cal. Jan. 3, 2011) (179 calls were not a violation where, among other things, plaintiff did not ask defendant to stop calling).

It is also noteworthy that Judge Seybert agreed with the defendant that whether it was

---

[20] After entry of plaintiff's dispute of the debt into its ICE-System but prior to transmittal of that information, IC only called plaintiff's residence three more times in an attempt to contact him. Bacon Aff., ¶8.

able to reach the plaintiff and when the plaintiff asked the defendant to stop calling was relevant to whether the defendant *intended* to annoy, abuse or harass (the basis for a claim under 15 U.S.C. §1692(d)(5)). The court reasoned that simple logic recognizes that an inference of intent to annoy, abuse, etc. is "much more readily drawn against a defendant who repeatedly calls someone after being asked to stop." 2012 U.S. Dist LEXIS 4362, at *8. Again, the court relied on a well-developed body of case law that reflected this rationale. *See, e.g., Clingaman,* 2011 WL 2078629, at *4; *Jones,* 2011 WL 2050195, at *3 (awarding defendants summary judgment where "[t]here is no genuine issue of fact that Plaintiff asked the collectors to stop calling, or asked them to refrain from calling or specifically at work or complained about the number of calls received"); *Mammen v. Bronson & Migliaccio, LLP,* 715 F. Supp.2d 1210 (M.D. Fla. 2009)(no violation of section 1692d(5) where there was no evidence that calls were made continuously or at a time of day a reasonable jury could find to be harassment); *cf., Prewitt v. Wolpoff & Abramson, LLP,* 2007 WL 841778, at *3 (W.D.N.Y. March 19, 2007) (denying the defendant summary judgment where it continued to call the plaintiff after the plaintiff said he could not pay the debt due to financial constraints). *Chavious* and the other cited cases instruct that as a matter of law, IC's (unanswered) calls to Sussman made during reasonable hours and times cannot constitute a violation of any section of the FDCPA.

Judge Seybert also addressed the plaintiff's claim under section 1692(d)(6), which prohibits debt collectors from placing telephone calls without meaningful disclosure of the caller's identity. In that case--as here--the defendant did not leave voice mail messages after any of its 36 calls. The court held that "[a]lthough *subsection (6)* is imprecisely worded, the Court agrees with other courts that have considered the FDCPA as a whole and concluded that the failure to leave voicemail messages, without more, does not amount to a *Section 1692(d)(6)*

violation." 2012 U.S. Dist LEXIS 4362, at *9, *10 (italics in original) (citing *Rucker v. Nationwide Credit, Inc.,* 2011 WL 25300, at *3 (E.D. Cal. Jan. 5, 2011); *Udell v. Kan. Counselors, Inc.* 313 F. Supp.2d 1135, 1144 (D. Kan. 2004); *Fashakin v. Nextel Commc'ns,* 2009 WL 790350, at *8 (E.D.N.Y. Mar. 25, 2009)). *A fortiori*, Judge Seybert's reasoning and an ample body of supporting case law compels a similar determination that the failure by the automatic dialer to identify IC on its calls to plaintiff does not give rise to a violation under section 1692d(6).

Plaintiff's other substantive claim pertains to the last three telephone calls made to him by the automatic dialer. 15 U.S.C. §1692c(c). These calls were made after receipt and entry of his letter disputing the debt into the ICE-System on the morning of November 23, 2011.[21] The Bacon Affidavit explains that the ICE-System and the Automatic Dialer System are not linked but instead are independent of the other. Information from the ICE-System is transmitted overnight to the dialer system. Hence, the dialer cannot act upon updated information (such as plaintiff's dispute of the debt) until the next day at the earliest. We know that is what happened in this particular instance since IC's records show that no more calls were made to Sussman after November 23, 2011.

Clearly, IC's so-called error was due to mere inadvertence. Under the circumstances, recovery is barred by the bona fide error defense. The defense provides that "[a] debt collector may not be held liable in any action...if the debt collector shows by a preponderance of the evidence that the violation was unintentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. §1692k(c). The defense requires a defendant to show that (i) the violation was unintentional and (ii) resulted from a bona fide error notwithstanding procedures reasonably adapted to avoid any

---

[21] Bacon Aff., ¶8.

such error. *Pipiles v. Credit Bureau of Lockport,* 886 F.2d 22 (2d. Cir. 1989), *cited in Puglisi v. Debt Recovery Solutions, LLC,* 2011 WL 4593334, at *5. A debt collector is not required to demonstrate that its procedures for avoiding FDCPA violations are "fool proof." Instead, the collector "must only show that its procedures constitute a 'reasonable precaution.'" *Puglisi,* 2011 WL 4593334, at *5 (citing *Katz v. Asset Acceptance, LLC,* 2006 WL 3483921, at *2 (E.D.N.Y. Nov. 30, 2006); *Kort v. Diversified Collection Serv. Inc.,* 394 F.3d 530, 539 (7th Cir. 2005); *Hyman v. Tate,* 362 F.3d 965, 968 (7th Cir. 2004) (affirming lower court finding that debt collector's procedures were reasonable despite the fact that they left open some room for error)).

Judge Bianco's exhaustive analysis of the bona fide error defense in *Puglisi* is persuasive. In that case, as part of a settlement, the defendant, a debt collector, accepted and agreed to deposit the plaintiff's post-dated check on December 23, 2007. However, without prior notice to the plaintiff, the defendant's employee deposited the post-dated check one week prior to the agreed-upon date. The defendant conceded that by doing so it violated sections 1692f(2) and 1692f(4). However, the defendant claimed that it did so inadvertently and occurred notwithstanding written procedures and training designed to prevent such errors. Among other things, the defendant submitted evidence showing that its collectors received a training manual and training designed to prevent the type of error that occurred. The court agreed that at most a clerical error resulted and the bona fide error defense barred recovery. *Accord, Smith v. Transworld Systems, Inc.,* 953 F.2d 1025 (6th Cir. 1992), where the court dismissed a claim under section 1692c(c) where the debt collector showed that a second collection letter mailed to the plaintiff after it received a cease and desist letter from the plaintiff was the result of inadvertence, i.e., the defendant's employee either failed to call the defendant's main office to stop the second letter from being mailed or the main office routed the stop notice to the wrong department.

21

IC satisfies the second prerequisite of the *bona fide* error defense since it has well-defined policies and procedures designed to prevent the conduct complained of herein. The Bacon Affidavit avers that IC's employees receive thorough training covering all aspects of debt collection. Among other things, employees must attend a one-week training course followed by two weeks of supervised field training. Employees are then evaluated by a trainer. Employees must pass comprehensive exams covering federal and state debt collection laws. The passing grade for the FDCPA test is 90%. If a prospective employee fails the exams three times he is ineligible for employment as a collector. Prospective employees are required to read and sign off on a series of policies, standards and agreements.[22] After their initial training, employees are required to stay current by taking semi-annual exams utilizing study guides and an e-learning course styled, "Review." Furthermore, memorandums are distributed by IC whenever new regulations are implemented. IC also monitors its employees on a daily basis to assure compliance with applicable law. IC also distributes Update Charts (i.e., written information pertaining to federal and state compliance issues).[23]

Needless to say, IC's rigorous "hands-on" training, testing and daily supervision inform, teach and remind employees, *inter alia,* that once correspondence is received from a debtor disputing a debt *all collection efforts must cease.*[24] While it is clear that IC's policies and procedures are not 100% fool-proof, settled case law shows they are not required to be. *See, e.g., Howe v. Reader's Digest Ass'n, Inc.,* 686 F. Supp. 461, 467 (S.D.N.Y. 1988)(summary judgment on bona fide error defense granted where the plaintiff "failed to adduce any evidence refuting [defendants'] affidavits...which demonstrate that [defendants] maintain extensive systems and

---

[22] *See,* cumulative Exhibit "2" to Bacon Aff.

[23] *See,* Exhibit "3" to Bacon Aff.

[24] Bacon Aff., ¶10.

procedures designed to [avoid errors]"); *Katz v. Asset Acceptance, LLC,* 2006 WL 3483921, at
*3 (granting summary judgment where the plaintiff failed to rebut the defendant's affidavits
concerning firm policies and procedures that the defendant had in place to avoid errors with
anything other than conclusory allegations that the defendant's actions were intentional); *Beattie
v. D.M. Collections, Inc.,* 751 F. Supp. 383, 389 (D. Del. 1991)(summary judgment granted
under bona fide error defense where the defendant provided training on FDCPA requirements,
employees attended periodic seminars and gave employees manuals and memorandums outlining
its FDCPA policy), cited in *Puglisi,* 2011 WL 4593334 at *7, *8.

We note that plaintiff also alleges violations of sections 1692e(10), (11) and 1692e(2)(A).
Complaint, ¶¶44, 47. Since section 1692e(10) prohibits a debt collector from using any false
representation or deceptive means to collect a debt, this claim fails for the simple reason that the
Complaint does not allege with particularity the false representation(s) made or any deceptive
conduct. Fed. R. Civ. P. 9(b). Regardless, the Bacon Affidavit shows that there were no false
representations let alone deceptive conduct committed by IC. Likewise, the claim under section
1692e(11), requiring a debt collector to disclose in its initial communication with the debtor that
it is attempting to collect a debt, is deficient. We assume this claim is based upon IC's automatic
dialer terminating the calls to plaintiff's residence without leaving a message. However, as we
showed, *Chavious* holds that a debt collector is *not* required to leave a message. Finally, we are
at a loss to understand how, based upon the allegations in the Complaint, IC could have violated
section 1692e(2)(A) which prohibits a debt collector from falsely representing the character,
amount or legal status of a debt. Suffice it to say, the pleadings and Bacon Affidavit show that no
such thing occurred.

## CONCLUSION

For all of the foregoing reasons, IC's motion to dismiss and/or for summary judgment

should be granted in all respects.

Dated: New York, New York
     May 15, 2012

KENNETH A. ELAN (KE–1729)
Attorney for Defendant
217 Broadway, Suite 603
New York, NY 10007
T (212) 619-0261/F (212) 385-2707