UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAVID SUSSMAN a/k/a MARK SUSSMAN, M.D.,
on behalf of himself and all others similarly situated,

                                **Plaintiff,**

-against-

I.C. SYSTEM, INC.,

                                **Defendant.**
------------------------------------------------------------X

Case No.: 12- CV-0181

**AFFIDAVIT OF RYAN BACON**

STATE OF MINNESOTA  )
                            ) ss.:
COUNTY OF RAMSAY    )

      **RYAN BACON**, first being duly sworn, deposes and says:

      1.    I am employed as the Director of Strategy & Audit by I.C. System, Inc. ("IC"). My duties include assisting company personnel in developing calling strategies. My team manages the dialer execution portion of its strategies and also performs internal auditing to be certain the strategies are working as designed. I make this Affidavit in support of the within motion by IC to dismiss and/or for summary of judgment. I am fully familiar with the facts and circumstances set forth below.

      2.    IC is a Minnesota corporation engaged in the principal business of attempting to collect debts on behalf of its clients. IC's main office is located at 444 East Highway 96, Saint Paul, Minnesota 55127.

      3.    In connection with the preparation of this Affidavit I reviewed the Debtor Summary of David Sussman, the plaintiff in the within Action (the "Summary"). A copy of the Summary is annexed as Exhibit "1." The Summary is a document generated by IC's "ICE-

System." The ICE-System is a computer program utilized by IC to record and store information pertaining to debtor accounts such as plaintiff's account. The Summary is a document maintained in the ordinary course of business of IC and it is in the ordinary course of IC's business to maintain such document. The Summary includes information pertaining to the name and address of IC's client; the name, address and residential telephone number of the debtor; the amount of the debt; IC's collection efforts such as the date an initial claim letter is mailed to the debtor; the date(s) and time(s) telephone calls are made to the debtor; the response, if any, by the debtor or his representative (such as an attorney) to IC's letters and calls; and, the date activity to collect the debt ceased.

4.  The Summary shows that plaintiff's account was opened by IC on November 3, 2011 and IC's client is a company called Xchange Telecom, P.O. Box 190433, Brooklyn, New York 11219. The debt is stated to be $164.34 (inclusive of a non-payment adjustment of $4.27). Since the account was not opened until November 3, 2011, no attempt was made to collect the debt from plaintiff prior to such date. On the same date of November 3, 2011, the Summary shows that IC mailed its initial claim letter to plaintiff.

5.  IC utilizes an Automatic Dialer System for the purpose of attempting to contact debtors to discuss their account. The system works as follows: the residential telephone number of a debtor (such as plaintiff's) is entered into the system. Thereafter, at periodic intervals of not less than 90 minutes, the system will automatically dial the debtor's telephone number in the attempt to contact him. If the debtor answers the call and further assuming that an IC representative is available, the call will be routed immediately to the representative to discuss the debt. If there is no representative available the call is routed to an outbound "hold queue" until a representative is available. A message is played advising the debtor to "please hold for the next

2

available representative." On the other hand, if no one answers the telephone or, instead, if the call is transferred to a voice mail, the automatic dialer will terminate the call without leaving a message.

6. My review of the Summary shows that a total of 51 telephone calls were made to plaintiff's residential telephone number commencing on November 4, 2011 and terminating on November 23, 2011. All such calls were made from Minnesota to New York. The Summary shows that no call was made earlier than 7:03 A.M. (Central Standard Time) or later than 7:59 P.M. (Central Standard Time). Your deponent notes that Central Standard Time is one hour *earlier* than Eastern Standard Time. Thus, while several telephone calls are stated to have been made prior to 8:00 A.M. such calls would be one hour *later* New York time.

7. The Summary discloses that with two exceptions that purportedly show simultaneous calls at 7:03 A.M. and at 6:27 P.M. on November 4, 2011, no call was made within 90 minutes of the preceding call. Your deponent discussed the "simultaneous calls" with IC's dialer support personnel. No problems were reported with the dialer system on that date. The only conclusion is that an error occurred in entering the information in the Summary since it is impossible for IC's dialer system to simultaneously call a telephone number at precisely the same time. The Summary further shows all of IC's calls to plaintiff went unanswered. Accordingly, the Automatic Dialer System terminated the calls without leaving a message.

8. The Summary shows that on November 23, 2011 at 11:19 A.M., a letter from plaintiff disputing the debt was received and entered into the ICE-System. Parenthetically, correspondence is delivered to IC's mailroom where it is sorted by mailroom employees. Debtor correspondence (such as plaintiff's letter) is then delivered to IC's Correspondence Department where dedicated representatives sort through the mail, code the same, if necessary, and update

the correspondence into the ICE-System. Three telephone calls were made later that same day to plaintiff's residential telephone number at 12:34 P.M., 2:50 P.M. and 5:49 P.M. No further efforts were made to collect the debt from plaintiff after November 23, 2011.

9.  The reason no further telephone calls were made after November 23, 2011 is the result of IC's well-established debt collection policies and procedures and the manner in which IC's systems operate. The policies and procedures instruct that once IC is notified that a debtor disputes a debt all collection efforts must cease. However, the ICE-System and the Automatic Dialer System are not interconnected. Instead, they act independently of the other. Information entered into the ICE-System (such as plaintiff's dispute of the debt) is transmitted *overnight* to the Automatic Dialer System. Hence, the dialer system cannot operate on the information received by the ICE-System until the next day. That is what occurred here and explains why no calls were made to plaintiff after November 23, 2011. It also explains why no other efforts were made to collect the debt from plaintiff from and after November 23, 2011.

10.  IC employees receive thorough training with respect to IC debt collection policies and procedures expressly including the cessation of all collection efforts once a debtor or his representative notifies IC that he disputes the debt. Among other things, employees must attend a one week training course followed by two weeks of supervised field training. As part of their training employees must read and acknowledge in writing that they have read IC's (i) Agreement to Access Credit Bureau (limiting the purposes for which they may access credit bureaus); (ii) policy for processing payments via telephone; (iii) Compliance Agreement, (iv) Quality Control Agreement; (v) Ergonomics Training Completion Form; (vi) Security Training Agreement; (vii) Answering Machine Talk Off; and (viii) ACA International's Code of Ethics and Code of Operations.  Annexed as cumulative Exhibit "2" are true and correct copies of IC's Training

Policy; Training New Hire Paper Work; New Hire and Semi-Annual Standards; Employee Agreement to Access Credit Bureaus; Ergonomics Training Completion Form; Quality Control Agreement; Payments Processed Over Phone Policy; and Answering Machine Talk Off.[1]

11. Employees are then evaluated by a trainer. Employees must pass comprehensive examinations covering federal and state debt collection laws. The passing grade for the FDCPA test is 90%. If a prospective employee fails the examinations three times he is ineligible for employment as a collector. After their initial training ends, employees are required to stay current by taking semi-annual examinations utilizing study guides and an e-learning course styled, "Review." Furthermore, memorandums are distributed by IC whenever new regulations are implemented. IC also regularly issues Update Charts (i.e., written information pertaining to federal and state compliance issues. Annexed as Exhibit "3" is a true and correct copy of an Update Chart. IC also monitors its employees on a daily basis to assure compliance with applicable law.

12. Further you deponent sayeth not.

_____
RYAN BACON

Sworn to before me this
 3rd  day of May 2012

_____
Notary public
PATRICIA I WAGNER
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2015

---

[1] Parenthetically, the Answering Machine Talk Off is inapplicable in this case. The Talk Off is the script used by IC's *collectors* when an answering machine picks up a call. Here, IC utilized its Automatic Dialer System (which, as stated above, is programmed to terminate a call rather than leave a message when the call goes to voice mail).